Docket No.: 16 Civ. 556 (AJN)(GWG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAFAEL JONES,

                                    Plaintiff,

                -against-

MICHAEL HOLMAN; MILES HOLMAN; EVAN
MELE; PATRICK VENETEC; DANIEL BERETTO,

                                    Defendants.

### MEMORANDUM OF LAW IN SUPPORT OF MICHAEL HOLMAN, MILES HOLMAN, EVAN MELE, PATRICK VENETEK, AND DANIEL BARRETO'S MOTION FOR SUMMARY JUDGMENT

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*   Attorney for Michael Holman, Miles Holman,*
*    Evan Mele, Patrick Venetek, and*
*    Daniel Barreto*
*   100 Church Street*
*   New York, N.Y.  10007*

*Of Counsel:  Christopher G. Arko*
*Tel:  (212) 356-5044*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

STANDARD OF REVIEW ............................................................................................ 8

ARGUMENT

      POINT I

            PLAINTIFF'S FALSE ARREST CLAIMS SHOULD BE DISMISSED BECAUSE HIS SEIZURE FOR PSYCHIATRIC EVALUATION WAS PRIVILEGED ....................................................................9

      POINT II

            IN THE ALTERANTIVE THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THERE WAS AT LEAST ARGUABLE PROBABLE CAUSE TO SEIZE PLAINTIFF.................................................................12

CONCLUSION ............................................................................................................. 14

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                                **<u>Pages</u>**

Anthony v. City of New York,
    2001 U.S. Dist. LEXIS 8923 (S.D.N.Y. 2001),
    <u>aff'd</u>, 339 F.3d 129 (2d Cir. 2003)......................................................................................9, 13

Arroyo v. City of New York,
    2016 U.S. Dist. LEXIS 89274 (S.D.N.Y. 2016),
    <u>aff'd</u> 682 Fed. Appx. 73...............................................................................................13

Arroyo v. City of New York,
    683 Fed. Appx. 73 (2d Cir. 2017)...............................................................................12

Bayne v, Provost,
    2005 U.S. Dist. LEXIS 40889 (N.D.N.Y. 2005).......................................................14

Bernard v. United States,
    25 F.3d 98 (2d Cir. 1994).............................................................................................9

Bradway v. Gonzales,
    26 F.3d 313 (2d Cir. 1994).........................................................................................12

Cartier v. Lussier,
    955 F.2d 841 (2d Cir. 1992).......................................................................................12

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).....................................................................................................8

Curley v. Village of Suffern,
    268 F.3d 65 (2d Cir. 2001).........................................................................................10

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
    504 U.S. 451 (1992).....................................................................................................8

Fahie v. Mainor,
    2013 U.S. Dist. LEXIS 49803 (S.D.N.Y. 2013)....................................................10, 13

Figueroa v. Mazza,
    825 F.3d 89 (2d Cir. 2016).........................................................................................12

Hicks v. City of New York,
    2015 U.S. Dist. LEXIS 134234 (E.D.N.Y. 2015),
    <u>adopted</u> 2015 U.S. Dist. LEXIS 136362 (2015).......................................................11

Higgins v. City of Oneonta,
    208 A.D.2d 1067 (A.D.3d 1994).................................................................................9

**Cases**                                                                                    **Pages**

Jaramillo v. Weyerhaeuser Co.,
    536 F.3d 140 (2d Cir. 2008)............................................................................8

Kerman v. City of New York,
    374 F.3d 93 (2d Cir. N.Y. 2004)................................................................9, 10

Matushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).......................................................................................8

Monday v. Oullette,
    118 F.3d 1099 (6th Cir. 1997) .......................................................................9

Panetta v. Crowley,
    460 F.3d 388 (2d Cir. 2006)..........................................................................10

Project Release v. Prevost,
    551 F. Supp. 1298 (E.D.N.Y. 1982) ...........................................................9-10

Savino v. City of New York,
    331 F.3d 63 (2d Cir. 2003)..............................................................................9

Scott v. Harris,
    550 U.S. 372 ...................................................................................................8

Thomas v. Culberg,
    741 F. Supp. 77 (S.D.N.Y. 1990) ..................................................................9

**Statutes**

42 U.S.C. § 1983...................................................................................................2

Fed. R. Civ. P. 56.............................................................................................2, 8

Fed. R. Civ. P. 56(c) ..............................................................................................8

N.Y. Mental Hygiene L. § 9.41 ..............................................................9, 12, 13, 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x

RAFAEL JONES,

                                        Plaintiff,

                -against-
                                                                16 Civ. 556 (AJN)(GWG)
MICHAEL HOLMAN;  MILES HOLMAN;  EVAN MELE;
PATRICK VENETEC; DANIEL BERETTO,

                                        Defendants.

-------------------------------------------------------------------------- x

### MEMORANDUM OF LAW IN SUPPORT OF MICHAEL HOLMAN, MILES HOLMAN, EVAN MELE, PATRICK VENETEK, AND DANIEL BARRETO'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

At issue in this matter is the defendant police officers' detention of plaintiff, which culminated in his transportation to Bellevue Hospital as an "emotionally disturbed person" ("EDP").  Plaintiff was thereafter involuntarily hospitalized for four days, during which he was medically diagnosed as a paranoid schizophrenic who posed a danger to himself and others. When the defendant officers first encountered plaintiff, he was outside of the offices of a veterans' service agency called Services for the Underserved ("SUS").  SUS staff told the officers that plaintiff had aggressively yelled at and threatened them before the officers arrived – something plaintiff had done on numerous prior occasions.  Moreover, plaintiff was erratic and agitated while the officers were on scene.  Plaintiff's behavior had led the SUS staff to believe that he was suffering from mental illness, a suspicion that was confirmed by Bellevue Hospital

medical staff.  Plaintiff now brings this action pursuant to 42 U.S.C. § 1983[1] against Police Officers Michael Holman, Miles Holman, Evan Mele, Patrick Venetek,[2] and Daniel Barreto[3] alleging that he was falsely arrested.  (Ex. B [Am. Compl.] at p. 9[4] – 15)  Defendants move herein for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to the sole claim.

## STATEMENT OF FACTS

In late 2015, plaintiff began receiving assistance from SUS, an agency that provides housing aid and other services to homeless veterans. (Ex. C [Plaintiff Dep.] at 84: 5-12, 85: 5-11; Ex. D [Wawrynek Dep.] at 9: 6-19, 11: 17 – 12:12; Ex. E [Robinson Dep.] at 8: 10-16, 10: 21 – 11: 4; Ex. F [McCracken Dep.] at 9: 6-14)  Among the SUS staff who worked directly with plaintiff were Program Director Adam Wawrynek, Deputy Director Nicole Robinson, and case manager Molly McCracken. (Ex. C [Plaintiff Dep.] at 88: 16 – 89: 7, 90: 2-13; Ex. D [Wawrynek Dep.] at 10: 12-17, 12: 16 – 13:5; Ex. E [Robinson Dep.] at 9: 7-9, 11: 8-22;  Ex. F [McCracken Dep.] at 11: 15-23, 12: 17 – 13: 10)

Prior to January 14, 2016, plaintiff had been aggressive and threatening to SUS staff on numerous occasions.  (Ex. D [Wawrynek Dep.] at 19: 16-20, 22: 3 – 23: 25, 64: 6-12; Ex. E [Robinson Dep.] at 16: 14-20, 18: 6-21, 22: 5-24; Ex. F [McCracken Dep.] at 22: 24 – 25: 11)  Plaintiff had also exhibited what Robinson characterized as a "disconnect from reality," explaining that "oftentimes…he would talk about incidents that did not occur, things that did not happen."

---

[1] In his Fifth Amended Complaint, plaintiff purports to bring this action pursuant to various federal statutes and Constitutional Amendments.  However, defendants interpret the complaint as being a civil rights action for a purported 4th Amendment violation pursuant to 42 U.S.C. § 1983.

[2] Patrick Venetek's surname is misspelled in the Fifth Amended Complaint.

[3] Daniel Barreto's surname is misspelled in the Fifth Amended Complaint.

[4] References to page numbers in Ex. B, the Fifth Amended Complaint, correspond to the page numbers in the ECF stamp for Document 139.

(Ex. E [Robinson Dep.] at 34: 1 – 35: 22, 39: 24 – 40: 3)  Wawrynek testified that plaintiff "would often accuse [SUS] staff of working against his best interests, plotting against him, things that came across as paranoid." (Ex. D [Wawrynek Dep.] at 20: 11-13)   McCracken also believed plaintiff may have been suffering from "some sort of paranoia" based on aggressive text messages she received from him. (Ex. F [McCracken Dep.] at 17: 25 – 18:4)

Based on his behavior, Wawrynek, Robinson, and McCracken believed plaintiff was suffering from untreated mental illness.   (Ex. D [Wawrynek Dep.] at 19: 2 – 21: 7; Ex. E [Robinson Dep.] at 39: 23 – 40:3; Ex. F [McCracken Dep.] at 17: 9 – 18: 14, 20: 8 – 21: 13)  They had even tried to connect him with mental health services, but as far as they knew he had rebuffed their efforts. (Id.)   Incidentally, their suspicions were correct, as plaintiff had in fact been diagnosed with paranoid schizophrenia at Bellevue Hospital in September 2014. (Ex. L [Bellevue Recs.] at Def. 366)

On January 14, 2016, Wawrynek, Robinson, and McCracken were working at the SUS office located on the 11th floor of 39 Broadway in Manhattan. (Ex. D [Wawrynek Dep.] at 26: 11-22; Ex. E [Robinson Dep.] at 19: 2-9, 20: 22-24; Ex. F [McCracken Dep.] at 25: 24 – 26: 7, 27: 22 – 28: 3)   Plaintiff came into the SUS office that day and instigated a confrontation. (Ex. D [Wawrynek Dep.] at 30: 3-6, 32: 13 – 33:10, 34: 10 – 35: 1, 37: 3-8, 38: 18-23; Ex. E [Robinson Dep.] at 25: 16-23, 26: 18-25, 27: 10-16; Ex. F [McCracken Dep.] at 38: 17 – 41: 7; Ex. M [Incident Rpt.] at Def. 064 – Def. 065)  It began when plaintiff sent McCracken a series of text messages demanding that she help him get money from a bank. (Ex. F [McCracken Dep.] at 32: 2-9; Ex. M [Incident Rpt.] at Def. 064)  He then confronted McCracken in person and demanded that she provide him with a metrocard to sell for cash, which she refused to do. (Ex. D [Wawrynek Dep.] at 30: 18 – 31: 1, 32: 21-25; Ex. E [Robinson Dep.] at 45: 12 – 46: 3; Ex. F [McCracken

Dep.] at 39: 11-24; Ex. M [Incident Rpt.] at Def. 064)  Plaintiff was agitated and irate and began to aggressively yell at Wawrynek, Robinson, and McCracken. (Ex. D [Wawrynek Dep.] at 32: 13-25; Ex. E [Robinson Dep.] at 25: 18-23, 27: 10-16, 61: 6-15; Ex. F [McCracken Dep.] at 40: 21 – 41: 7; Ex. M [Incident Rpt.] at Def. 065)  Plaintiff's behavior made McCracken fear for her safety, so she closed herself in a room to hide from him.  (Ex. F [McCracken Dep.] at 42: 16 – 43: 11; Ex. M [Incident Rpt.] at Def. 065)

The building's security guard was notified of the situation and called 911[5] to request police assistance because there were people fighting on the 11th floor. (Ex. N [911 Rec.])  The security guard reported that the fight involved someone from "some type of mental facility for veterans." (Id. at 00:44 – 00:47)  A police radio dispatch was thereafter put over the air for a fight involving an emotionally disturbed person ("EDP") at 39 Broadway.  (Ex. O [Radio Rec.] at 00:00 – 00:42) Police Officers Michael Holman, Miles Holman, Evan Mele, Patrick Venetek, and Daniel Barreto responded.  (Ex. G [Michael Holman Dep.] at 8: 13-22; Ex. H [Miles Holman Dep.] at 9: 6-10, 12: 4 – 15; Ex. I [Mele Dep.] at 11: 13 – 12: 10; Ex. J [Venetek Dep.] at 8: 3-12; Ex. K [Barreto Dep.] at 7: 23 – 8: 14)

The officers took the elevator to the 11th floor, where they encountered plaintiff, Wawrynek and Robinson in the hallway outside of the SUS office. (Ex. C [Plaintiff Dep.] at 120: 17-25; Ex. D [Wawrynek Dep.] at 42: 15-20, 63: 15-19; Ex. E [Robinson Dep.] at 29: 25 – 30: 4; Ex. F [McCracken Dep.] at 48: 5-20; Ex. G [Michael Holman Dep.] at 11: 6-19; Ex. H [Miles Holman Dep.] at 21: 9-24, 22: 11-18; Ex. J [Venetek Dep.] at 10: 12 – 11: 1)  It was apparent to the officers that Wawrynek and plaintiff knew each other. (Ex. G [Michael Holman Dep.] at 14: 12-20; Ex. H [Miles Holman Dep.] at 21: 13-17; Ex. J [Venetek Dep.] at 11: 3-17)   The officers

---

[5] The security guard called 911 from the lobby and did not witness the incident involving plaintiff.  (Ex. N [911 Rec.])  Wawrynek and Robinson believed another tenant on the 11th floor made the call. (Ex. D [Wawrynek Dep.] at 36: 6-9, 48: 8-10; Ex. E [Robinson Dep.] at 29: 12-20)

understood that the two had a relationship that involved Wawrynek providing plaintiff with services of some variety. (Ex. D [Wawrynek Dep.] at 48: 13-19; Ex. G [Michael Holman Dep.] at 14: 12-20; Ex. H  [Miles Holman Dep.] at 21: 12-21, 22: 11-18; Ex. J [Venetek Dep.] at 10: 17-24, 13: 21-24)

    The officers spoke to Wawrynek about what happened with plaintiff before the officers arrived. (Ex. D [Wawrynek Dep.] at  48: 13-19; Ex. G [Michael Holman Dep.] at 13: 4 – 14: 20; Ex. H [Miles Holman Dep.] at 22: 11-18, 30: 7-24, 41: 17-24, 42: 2-6; Ex. I [Mele Dep.] at 16: 4-7, 36: 13 – 37: 7; Ex. P [Michael Holman Memo Book] at Def. 010; Ex. Q [Mele Memo Book] at Def. 015 – Def. 016; Ex. R [Aided Card] at Def. 045)  Wawrynek explained that plaintiff got upset and aggressive and made verbal threats to SUS staff.[6] (Ex. G [Michael Holman Dep.] at 17: 25 – 18:4, 18: 8-10, 29: 13-24; Ex. H [Miles Holman Dep.] at 23: 22 – 24: 4, 32: 14-21; Ex. I [Mele Dep.] at 34: 16-22, 36: 13 – 37: 7; Ex. P [Michael Holman Memo Book] at Def. 010; Ex. Q [Mele Memo Book] at Def. 015 – Def. 016; Ex. R [Aided Rpt.] at Def. 045)    Wawrynek also described plaintiff's prior behavior at SUS, explaining that "one day when [plaintiff] comes in for his services everything could run smooth and swell, and other times he will cause commotions, he will get into arguments, make threats to employees." (Ex. D [Wawrynek Dep.] at 48: 13-19; Ex. G [Michael Holman Dep.] at 13: 13-17, 17: 11-20; Ex. P [Michael Holman Memo Book] at Def. 010;

[6] There was some inconsistency among the officers as to what Wawrynek told them.  Officer Venetek believed that Wawrynek said plaintiff had made suicidal statements. (Ex. J [Venetek Dep.] at 13: 2) Officer Miles Holman testified that plaintiff was upset he had been denied some services, but he did not specifically mention that Wawrynek said plaintiff was aggressive or made threats. (Ex. H [Miles Holman Dep.] at 23: 20 – 24: 4)  However, it is undisputed that Wawrynek did speak to the officers and at least told them about plaintiff's aggressive behavior at the SUS office prior to January 14, 2016. (Ex. D [Wawrynek Dep.] at 48: 13-19)  Though Wawrynek could not recall what else he told the officers, both Officer Michael Holman and Officer Mele wrote in their memo books that plaintiff had been aggressive and threatening to SUS staff on the date of incident.  Moreover, the same information is documented in the EMT report.  Additionally, the SUS witnesses all testified that there had indeed been an incident with plaintiff before the officers arrived during which he was aggressive, yelled, and made McCracken feel unsafe.  Accordingly, no rational jury could find the officers were completely unaware of the fact that, before they arrived that day, plaintiff had been aggressive and threatening to SUS staff.

Ex. R [Aided Rpt.] at Def. 045) Officer Mele believed Wawrynek was "fearful" and "concerned." (Ex. I [Mele Dep.] at 18: 15-17)

  Furthermore, plaintiff's behavior while the police were on scene was consistent with the radio dispatch about an EDP and appeared to corroborate Wawrynek's statements.   (Ex. G [Michael Holman Dep.] at 15: 11-25; Ex. H [Miles Holman Dep.] at 35: 15-2, 36: 10-19, 43: 20 – 44: 8, 44: 20-24, 45: 22-25, 49: 4-17, 49: 24 – 50: 18, 80: 4-11; Ex. I [Mele Dep.] at 42: 24 – 43: 8, 46: 3-8)  Plaintiff was "upset," "agitated," "erratic," "raising his voice" and seemed incapable of comprehending what the officers were saying to him.  (Ex. S [Audio Rec.]; Ex. E [Robinson Dep.] at 35: 22 – 36: 7, 58: 14-16; Ex. G [Michael Holman Dep.] at 12: 11-13, 15: 15-25; Ex. H [Miles Holman Dep.] at 44: 1-25, 45: 22-25, 79: 25 – 80: 18; Ex. I [Mele Dep.] at 20: 2, 43: 4-8; Ex. K [Barreto Dep.] at 13: 22-23)  He was argumentative with the officers and demanded to be released. (Ex. S [Audio Rec.])   The officers informed plaintiff he was being detained for a psychiatric evaluation, and plaintiff aggressively responded that he had already had one and was "cleared." (Id. at 2:43 – 2:56)  Based on all the circumstances, Officer Miles Holman believed plaintiff was experiencing a "mental episode." (Ex. H [Miles Holman Dep.] at 49: 24 – 50: 9)  Robinson testified that based on plaintiff's behavior, the officers could have reached the same conclusion she had that plaintiff was likely suffering from mental illness. (Ex. E [Robinson Dep.] at 40: 7-18, 53: 5-11)

  Emergency Medical Technicians ("EMT") arrived shortly after the police.  (Ex. C [Plaintiff Dep.] at 134: 20 – 135: 5)  They noted in their Prehospital Care Report Summary that plaintiff was "agitated," and that they were "informed that [plaintiff] was on (sic) office and started to act aggressive and to make threats to staff," and that "[plaintiff] inform (sic) that he just got into a (sic) argument with the staff." (Ex. T [EMT Rpt.] at Def. 476)

In light of plaintiff's behavior and the information provided by Wawrynek, plaintiff was handcuffed and transported to Bellevue Hospital as an EDP who posed a potential danger to himself or others.  (Ex. G [Michael Holman Dep.] at 15: 11-25, 17: 6-20; Ex. H [Miles Holman Dep.] at 35: 6-21, 41: 17-24, 42: 15-19, 50: 10-19; Ex. I [Mele Dep.] at 42: 24 – 43: 8, 45: 14 – 46: 8; Ex. R [Aided Rpt.] at Def. 045)  Officer Michael Holman and Officer Mele escorted plaintiff to Bellevue Hospital. (Ex. G [Michael Holman Dep.] at 25: 3-15)  The officers walked plaintiff into the hospital, removed the handcuffs, and left shortly thereafter. (Ex. C [Plaintiff Dep.] at 154: 10-15; Ex. G [Michael Holman Dep.] at 24: 23 – 25: 1, 25: 19-21, 26: 24 – 27: 5, 30: 13-16, 31: 25 – 32: 7)

Upon his arrival at the hospital, plaintiff continued to be agitated and threatening.  (Ex. L [Bellevue Recs.] at Def. 328, Def. 341)  Indeed, his behavior was so concerning that the doctors administered a sedative "for safety." (Id.)  Medical staff subsequently spoke to Wawrynek and Robinson over the telephone about what had transpired at the SUS office.[7] (Id. at Def. 334 – Def. 335)  Both reiterated that plaintiff had been agitated, aggressive, and threatening – the same behavior Wawrynek had described to the police. (Id.)

Based on plaintiff's behavior at Bellevue and the information provided by Wawrynek and Robinson, medical staff concluded, consistent with the SUS staff's suspicions, that plaintiff was "suffer[ing] from a chronic psychotic illness."  (Id. at Def. 334)  The doctors further determined that plaintiff posed a "substantial danger to self and others" and met the "standards for involuntary commitment." (Id. at Def. 343)  He was therefore held involuntarily at Bellevue until a judge ordered his release four days later. (Id. at Def. 349 – Def. 350)  During plaintiff's hospitalization,

---

[7] The medical records contain a summary of Robinson's statement; accordingly, Robinson's deposition testimony that she did not speak to Bellevue was clearly mistaken. (Ex. E [Robinson Dep.] at 43: 19-21)

medical staff diagnosed him with paranoid schizophrenia for the second time in less than a year and a half. (Id. at Def. 350 – Def. 351)

**STANDARD OF REVIEW**

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, the Court determines that no genuine issue of material fact exists.  See Fed. R. Civ. P. 56; Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992).  A motion for summary judgment, therefore, requires plaintiff to "make a showing sufficient to establish the existence of an element essential to that party's case…since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Thus, in order to avoid summary judgment, the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial.  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  The non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the non-moving party must "cit[e] to particular parts of the materials in the record" to show that a fact is generally disputed." Fed. R. Civ. P. 56(c); see also Matushita, 475 U.S. at 587.  While the evidence must be viewed in the light most favorable to the non-moving party, when there is reliable objective evidence, the evidence may speak for itself. See Scott v. Harris, 550 U.S. 372, 378-81(2007).

**ARGUMENT**

**POINT I**

**PLAINTIFF'S FALSE ARREST CLAIMS SHOULD BE DISMISSED BECAUSE HIS SEIZURE FOR PSYCHIATRIC EVALUATION WAS PRIVILEGED**

Plaintiff's claim for false arrest lacks merit because defendants' seizure of him for psychiatric evaluation was based upon probable cause and was thus privileged pursuant to New York Mental Hygiene Law § 9.41. To state a claim of false arrest, a plaintiff must show: "'(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Mental Hygiene Law § 9.41 provides in pertinent part that "[a]ny…police officer…may take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others." N.Y. M.H.L. § 9.41. The Second Circuit has "interpreted this provision as imposing the same objective reasonableness standard that is imposed by the Fourth Amendment." Kerman v. City of New York, 374 F.3d 93, 100 (2d Cir. N.Y. 2004) (internal quotation marks omitted). Thus, "under the Fourth Amendment, an officer may seize a person for a psychiatric evaluation if the officer has 'probable cause to believe that the person is dangerous to himself or others.'" Anthony v. City of New York, 2001 U.S. Dist. LEXIS 8923, *16 (S.D.N.Y. 2001) aff'd, 339 F.3d 129 (2d Cir. 2003) (quoting Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997)). Furthermore, "detention pursuant to this statute does not require proof that the person presents an *immediate* danger to others." Higgins v. City of Oneonta, 208 A.D.2d 1067, 1069 (A.D.3d 1994) (citing Thomas v. Culberg, 741 F. Supp. 77, 81, n. 1 (S.D.N.Y. 1990); Project Release v. Prevost, 551 F.

Supp. 1298, 1305 (E.D.N.Y. 1982)) (emphasis added).   The Second Circuit has repeatedly recognized that "police officers often must make instant assessments with regard to a person's mental health and must be accorded considerable latitude as to the judgments they reach." Kerman, 374 F.3d at 100.

In this matter, the officers possessed ample information to support a finding of probable cause that plaintiff was mentally ill and posed a danger to himself or others.   Initially, the officers went to 39 Broadway in response to a 911 call for a fight involving an EDP. Upon arrival, they encountered plaintiff, Wawrynek,[8] and Robinson.   At the outset, it was apparent to the officers that plaintiff and Wawrynek knew each other, and that Wawrynek was responsible for providing plaintiff with services of some variety.   Wawyrnek told the officers that plaintiff had been aggressive and had threatened SUS staff before the officers arrived.   Further, Wawrynek said that plaintiff had been aggressive to the staff on previous occasions.   This was consistent with the information in the radio dispatch about a fight.   On this basis, the officers had probable cause to believe plaintiff posed a danger to the SUS staff.   See Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (when information is received from a victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity"); Fahie v. Mainor, 2013 U.S. Dist. LEXIS 49803, *11 (S.D.N.Y. 2013) (when responding to a call about an EDP, "Officers have 'probable cause to arrest if [they] received [their] information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity,'" quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)).

Moreover, plaintiff's behavior in front of the officers was consistent with the radio transmission about an EDP.   He was raising his voice and was agitated, upset, and erratic.   When

---

[8] The officers believed, though they were mistaken, that Wawrynek was the 911 caller.

the officers spoke to him, he seemed unable to rationally comprehend what they were saying. He alluded to his psychiatric history when he aggressively told the officers he had already had a psychiatric evaluation and had been "cleared." It is obvious that plaintiff was exhibiting the same sort of conduct that had led the SUS staff to suspect that he was suffering from a paranoid mental illness and was in need of mental health treatment; indeed, Robinson believed that when the officers encountered him at the SUS office they "could have come to the same sort of assumption…that there may be some mental health issues with [plaintiff.]" (Ex. E [Robinson Dep.] at 39: 12-18) Officer Miles Holman believed plaintiff was experiencing a "mental episode[9]." (Ex. H [Miles Holman Dep.] at 49: 24 – 50: 9) Based on the totality of these circumstances, it was certainly reasonable for the officers to believe that plaintiff was mentally ill and posed a danger to himself or others and was in need of a psychiatric evaluation. See Hicks v. City of New York, 2015 U.S. Dist. LEXIS 134234, *15-*18 (E.D.N.Y. 2015), adopted 2015 U.S. Dist. LEXIS 136362 (2015).

Furthermore, the officers were not alone in reaching this conclusion. Bellevue medical staff also found that plaintiff posed a substantial danger to himself or others and went so far as to involuntarily hospitalize him four days. In fact, plaintiff's behavior upon arrival at Bellevue was so agitated and threatening that medical staff injected him with a sedative for safety. While the doctors' diagnosis was made after the police seized plaintiff, it was based on their observations of his behavior, coupled with information supplied by Wawrynek and Robinson about plaintiff's conduct in the SUS office. Certainly, if the doctors were so convinced that plaintiff posed a danger to himself or others based on these factors that they involuntarily hospitalized him for four days, it was reasonable for the officers, who possessed substantially the same evidence, to reach the same conclusion.

---

[9] It is significant in this regard that 16 months before plaintiff was seized by the defendants, he was medically diagnosed with paranoid schizophrenia.

**POINT II**

**IN THE ALTERANTIVE THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THERE WAS AT LEAST ARGUABLE PROBABLE CAUSE TO SEIZE PLAINTIFF**

At the very least, the officers had arguable probable cause to seize plaintiff and thus are entitled to qualified immunity. The "doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known…or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." Bradway v. Gonzales, 26 F.3d 313, 317-18 (2d Cir. 1994) (internal citations and quotations omitted). Where reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established rights, the immunity defense is available. Malley, 475 U.S. at 341; Cartier v. Lussier, 955 F.2d 841, 846 (2d Cir. 1992). The main "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Saucier, 533 U.S. at 205. Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Id. at 202 (quoting Malley, 475 U.S. at 341). "In other words, 'an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of the arrest, that probable cause existed.'" Arroyo v. City of New York, 683 Fed. Appx. 73, 74 (2d Cir. 2017) (quoting Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016)).

It simply cannot be said that under the circumstances here, no reasonable officer would have detained plaintiff pursuant to MHL § 9.41. On the contrary, it was objectively reasonable for the officers to believe that they had no viable alternative course of action. When they encountered

plaintiff, he was in the presence of the SUS staff towards whom he been aggressive and threatening moments earlier.  Plaintiff's behavior had apparently been so extreme that it precipitated a 911 call for a fight involving an EDP.  Nothing the officers heard or saw invalidated this information or served to diminish the officers' concerns.  Wawrynek even told the officers that plaintiff's aggressive behavior that day was not unique or an aberration, as he had acted the same way in the past.  Confronted with all these circumstances, it was objectively reasonable for the officers to detain plaintiff pursuant to MHL § 9.41. See Arroyo v. City of New York, 2016 U.S. Dist. LEXIS 89274 at *12 (S.D.N.Y. 2016), aff'd 682 Fed. Appx. 73 (granting qualified immunity to officers who detained plaintiff pursuant to MHL § 9.41 based on their observations of plaintiff's erratic behavior combined with a 911 call that was corroborated by a witness with personal knowledge of plaintiff's conduct).  The reasonableness of the officers' determination that plaintiff posed a danger to himself or others was even affirmed by the medical staff at Bellevue, who elected to involuntarily hospitalize him based on the same concerns. See Fahie, 2013 U.S. Dist. LEXIS 49803 at *15 (granting qualified immunity and finding that since "plaintiff remained hospitalized for a week, it appears that defendants' [determination that there was probable cause that plaintiff posed a danger to herself or others] was not only objectively reasonable but also correct").

Given that plaintiff refused to voluntarily submit to a psychiatric evaluation, the alternatives to detaining him pursuant to MHL § 9.41 – leaving him at the SUS office in the presence of the very people toward whom he had repeatedly been aggressive and threatening, or simply escorting him out of the building and leaving him on the street knowing he could return – were not practicable options.  Had plaintiff returned to the SUS office and engaged in yet another round of menacing behavior or worse, the officers could have been accused of abdicating their responsibility to ensure everyone's safety. See Anthony, 2001 U.S. Dist. LEXIS 8923 at *20-21

(granting qualified immunity to police officers who transported plaintiff to hospital, reasoning that the officers could later be accused of "callous indifference" had they not done so); see also Bayne v, Provost, 2005 U.S. Dist. LEXIS 40889, *28 (N.D.N.Y. 2005) (finding officers' seizure of plaintiff pursuant to MHL § 9.41 was reasonable when the alternative courses of action would not have feasibly ensured plaintiff's safety).  Certainly, considering the totality of the circumstances here, the officers' decision cannot be characterized as "plainly incompetent or a knowing violation of the law" and they are therefore entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Michael Holman, Miles Holman, Evan Mele, Patrick Venetek, and Daniel Barreto respectfully request that the Court grant their motion for summary judgment, together with such other and further relief as this Court may deem just and proper.

Dated:      New York, New York
            February 14, 2019

**ZACHARY W. CARTER**
Corporation Counsel of the
City of New York
*Attorney for Michael Holman, Miles Holman, Evan Mele, Patrick Venetek, and Daniel Barreto*
100 Church Street, Room 3-200
New York, New York 10007
(212) 356-5044

By:      _____/s/_____
            Christopher G. Arko
            Senior Counsel
            Special Federal Litigation Division

cc:     Rafael Jones (By Priority Mail)
        *Plaintiff Pro Se*
        1765 Townsend Avenue
        Apt. 5H
        Bronx, NY 10453

14